181 So.2d 63 (1965)
SOUTHWEST GAS PRODUCING COMPANY, Inc., et al., Plaintiffs-Appellees,
v.
CRESLENN OIL COMPANY et al., Defendants-Appellants.
No. 10464.
Court of Appeal of Louisiana, Second Circuit.
November 15, 1965.
Rehearing Denied December 21, 1965.
Writ Refused February 4, 1966.
*64 Downs & Dixon, Shreveport, for defendants-appellants.
Shotwell & Brown, Monroe, Riley B. Fell, Tulsa, Okl., Kilgore & Kilgore, Dallas, Tex., Smitherman, Smitherman, Purcell & Lunn, Shreveport, McHenry, Snellings, Breard, Sarto & Shafto, Monroe, Blanchard, Walker, O'Quin & Roberts, Shreveport, for plaintiffs-appellees.
Before HARDY, AYRES and BOLIN, JJ.
HARDY, Judge.
This is a concursus proceeding instituted by plaintiffs, processors of liquid hydrocarbons produced from the Cadeville Sand of the Cotton Valley formation in a field which extends over portions of Lincoln, Ouachita and Jackson Parishes. Under order granted by the court, petitioners were permitted to deposit in the Registry of the Court the sum of money accrued from and credited to production for the month of December, 1963, and to continue the deposit of such sums as might accrue during the pendency of these proceedings. The principal prayer of the petition was for judgment fixing the interests of the parties defendant and directing the proper distribution of all funds accrued and which might in the future accrue to the benefit of the parties at interest. By supplemental petition plaintiffs further prayed that all costs of these proceedings, including attorney's fees fixed by the court, be taxed against and paid out of funds on deposit in the Registry of the Court.
Numerous parties were named as defendants and, for the sake of continuity and clarification, we classify and identify the *65 named defendants, presenting conflicting claims, in groups as follows:
(1). Creslenn Oil Company and Marathon Oil Company (successor to Ohio Oil Company), which are hereinafter referred to in this opinion as MARATHON;
(2). John Franks, individually, John Franks and William O. Watson, Jr., as Testamentary Co-Executors of the Succession of Ralph R. Gilster; Horace H. Alvord, III, and M. R. Gallion, hereinafter referred to in this opinion as Franks;
(3). The First National Bank of Shreveport, hereinafter referred to in this opinion as THE BANK.
Also named as a defendant was Ashland Oil & Refining Company (successor in title to United Producing Company, Inc.), which, however, by answer simply submitted the dispute to the court for such determination as might be proper under the law and the evidence.
The controversy requiring adjudication arises fom the conflicting claims of MARATHON and FRANKS. A further issue is presented as the result of contentions made by THE BANK.
After trial there was judgment making a specific percentage allocation of interests, together with distribution of funds deposited in accordance with such allocation; further judgment taxing the costs of this proceeding, including an allowance of $3,500.00 as attorney's fees, against the funds deposited and ordering payment therefrom, and final judgment reserving to all parties the right of an accounting from plaintiffs for the proceeds of production. From this judgment FRANKS and THE BANK have appealed with respect to the allocation of funds and distribution of interests. No objection has been raised to that part of the judgment taxing costs and attorney's fees against the funds deposited and, accordingly, no issue in this respect is presented by this appeal.
Under date of August 15, 1961, all of the owners of working interests (with one exception as noted infra) in the minerals in the property described as the North Half of Section 32, Township 18 North, Range 1 West, Lincoln Parish, Louisiana, comprising 320 acres, entered into an OPERATING AGREEMENT. The Ohio Oil Company (to which corporation the Marathon Oil Company succeeded in name and interest) was designated as the operator of the unit area above described. Ohio had already commenced the drilling of a well located within the described unit area and the agreement provided the drilling of such well should be diligently continued to a depth sufficient to test the Cadeville Sand of the Cotton Valley formation. Prior to the confection of the OPERATING AGREEMENT the Commissioner of Conservation had developed a program establishing spacing and drilling units in the area involved upon the basis of 320 acre tracts delineated as the North and South halves of each Section of land. The parties to the OPERATING AGREEMENT anticipated the continuance of the half section drilling unit program and Article IV of the agreement provided as follows:
"The parties hereto anticipate that as a result of the hearing by the Commissioner of Conservation upon the application to further extend the provisions of Order No. 397-B-3, the Unit Area will be established as a drilling unit for the well hereinabove provided for in Article II. In the event that some other Unit Area is established for said well applicable to the Cadeville Sand as a result of such hearing, the provisions of this agreement shall be applicable to such other unit area and necessary adjustments in the interest of the parties, as specified in Exhibit "A" hereto, shall be made."
The Exhibit "A" referred to in the above quoted provision of the OPERATING AGREEMENT set forth extensively detailed provisions with respect to operations. It provided for a percentage allocation *66 based upon surface acreage ownership, controlling both the contribution to the costs of operation and the participation in proceeds, by the parties to the OPERATING AGREEMENT. This division of interest reflected an allocation as between the disputants involved in this action of approximately 80% to the Ohio Oil Company (predecessors, in name and interest, of Marathon Oil Company), 12.5% to Creslenn Oil Company, and 6.25% to the FRANKS group.
The well known as the Massey well commenced by Ohio on the unit area described in the OPERATING AGREEMENT was completed as a producer.
As anticipated by the parties, after a hearing the Commissioner of Conservation designated and established the unit area (The North Half of Section 32) as a drilling unit. However, before the Massey well was connected to a pipeline the Commissioner issued an order shutting in all wells completed in the Cadeville Sand, including the Massey well. Subsequent orders issued by the Commissioner respectively (1) continued the shut-in order pending provision for a cycling and pressure maintenance program; (2) established fixed boundaries and directives for the cycling of gas throughout a single field unit with respect to the Cadeville Sand; (3) issued an operating agreement fixing tract participation in the unit area. Two later orders issued by the Commissioner effected extensions, enlargements and revisions of the tract participation in the Cadeville Sand field unit.
Pursuant to the orders of the Commissioner, the operation of the Massey well was taken over by the designated field unit operator, Arkansas Louisiana Gas Company, and production from the said well, together with all others in the field unit, was included in the tract allocation made by the Commissioner.
The limit of the producing area of the Cadeville Sand field unit as fixed by the Commissioner ran through the North Half of Section 32 and had the effect of excluding a portion of the property lying generally in the northwestern part of the half-section. The working interest in the property area lying outside of the field limit fixed by the Commissioner was owned by Marathon and Creslenn.
The owner of a small unleased tract, B. H. Rainwater, was not a signatory to the OPERATING AGREEMENT and was the only party having any working interest in the North Half of Section 32 who did not join in said agreement. Rainwater's proportion of the operating cost has been carried by Marathon.
The issue presented in this case arises from the effect of the factual circumstances above narrated. This issue is definitely and rather simply presented by the opposed contentions of the MARATHON and FRANKS defendants, as follows:
MARATHON contends that the ownership of interests and the allocation and distribution of costs and proceeds from production are governed by the interests fixed by the parties in the OPERATING AGREEMENT. FRANKS contends that the participation factors fixed by the Commissioner applicable to the field-wide producing area of the Cadeville Sand Unit abrogate and supersede the interests allocated by the OPERATING AGREEMENT.
The material advantages to the respective parties which are represented in their opposed contentions are so obvious as to preclude necessity for comment.
The only other question presented relates to the appeal of THE BANK. By contemporaneous instruments, executed subsequent to but recorded before the OPERATING AGREEMENT, the individual defendant, John Franks, gave a mortgage upon and assigned his interest in all proceeds from a large number of mineral lease interests, including his interest in the property involved in this suit, in favor of THE *67 BANK. The mortgage and assignment were given as general collateral security for any indebtedness due or to become due by FRANKS to THE BANK. It is the contention of THE BANK that, under the law of registry as provided by Article 2264, and upon the basis of the principle enunciated in McDuffie v. Walker, 125 La. 152, 51 So. 100. THE BANK is protected against any effect of the OPERATING AGREEMENT with reference to Franks' interest. The gist of this contention is that THE BANK was not a party to the OPERATING AGREEMENT and that the rights granted under the mortgage and assignment prime such subsequently recorded agreement.
FRANKS specifies error as to the judgment appealed from in a number of particulars, most of which are generally comprehended under the principal argument that the creation of the field-wide Cadeville Sand Unit and the allocation of production from individual tracts located in the field, as defined by the Commissioner of Conservation, superseded the provisions of the OPERATING AGREEMENT and had the effect of abrogating this private contract. Another facet of the same argument is that the orders of the Commissioner had the effect of a failure of "cause" or resulted in the imposition of a resolutory or suspensive condition with respect to the OPERATING AGREEMENT.
We think the above contentions are adequately disposed by the opinion of the Supreme Court in Monsanto Chemical Co. v. Southern Natural Gas Co. (1958), 234 La. 939, 102 So.2d 223. Although there are some slight distinctions in the cases, they are not material and have no effect upon the principle re-enunciated in the cited case. The opinion of Mr. Chief Justice Fournet quoted the rule already established in Arkansas Louisiana Gas Co. v. Southwest Natural Production Co. (1952), 221 La. 608, 60 So.2d 9, that "* * * private contractual rights * * * are only superseded when they are in conflict with the valid orders of the Commissioner of Conservation * * *." (cf. 7 Institute on Mineral Law, 116; XXIV L.L.R. 937).
The action of the Commissioner in the case before us was purely and simply an exercise of a conservatory measure. His allocation of the total field production to individual tracts was necessary for the protection of landowners and was never intended to affect the validity and enforcement of private agreements. This conclusion is inescapable in view of the provision in the Commissioner's order recognizing the distribution of production in accordance with any agreement in effect prior to the effective date of the field-wide unit agreement.
In allocating production to individual tracts located within the field limits, the Commissioner used a formula based 60% upon productive acre feet and 40% upon productive surface area. As a practical proposition this basis of allocation is the reason for the FRANKS' opposition since they would profit either from the greater weight given to the acre foot production factor, or, as they contend, from the complete exclusion of the tracts in the North Half of Section 32 which were determined by the Commissioner to lie outside of the producing limits of the Cadeville Sand. This claim does violence to the clear purpose and intent of the OPERATING AGREEMENT. At the time of its execution there could be no assurance that all of the property in the North Half of Section 32 would be productive. All parties to the agreement were experienced operators completely familiar with both the possible hazards and benefits involved in oil and gas operations. Implicit in the agreement was recognition of the fact that the distribution of costs upon the basis of surface acreage was, in the opinion of the parties to the agreement, equal to the proceeds which might result from sharing production upon the same basis. The change in position evidenced by the claim in this suit is simply a demonstration of the infallibility of hindsight as opposed to the *68 unknown and imponderable elements which lie outside the realm of ascertainable knowledge at the time of the negotiation of any contract. Prospects of loss and hopes of gain are the opposed possibilities which motivate the formulation of most contractual agreements. So long as the elements of error or fraud are not involved, it is the purpose of the law to enforce voluntary agreements without concern as to the disproportionate advantages which may ultimately result.
Counsel for FRANKS urgently argue that the parties to the OPERATING AGREEMENT contracted only with reference to production from the Massey well. We do not think this contention is tenable. The OPERATING AGREEMENT defined unit production as being that production from the Cadeville Sand through any well on the Unit Area. By the Commissioner's orders the production from the Massey well has been integrated with the production from all other wells in the field-wide unit. It logically follows that, for the purpose of the agreement, the share of production allocated to the tracts comprising the original half section unit must be considered as production from a well drilled on that unit.
LRS. 30:10(A) (1) (b) reads as follows:
"The portion of the production allocated to the owner of each tract included in a drilling unit formed by a pooling order shall, when produced be considered as if it had been produced from his tract by a well drilled thereon."
Although the statute relates to drilling units, we can find no ground for distinction in its application to a field-wide unit such as that created by the Commissioner in this case.
An additional error is asserted by FRANKS on the ground that the OPERATING AGREEMENT never came into existence because of the lack of acceptance by one of the parties named therein (Rainwater) as a party thereto. This contention is completely destroyed by the provisions contained in the OPERATING AGREEMENT that it "* * * shall be binding upon each party who executes the same, and upon his or its heirs, successors and assigns, regardless of the failure of any other party to execute the same."
We next proceed to the error asserted by THE BANK against the failure of the district judge to apply the public records doctrine with respect to its rights under the mortgage and assignment of production executed by John Franks. We can perceive no possible ground for the application of the public records doctrine as comprehended under R.C.C. Article 2264 and enunciated in McDuffie v. Walker, supra. No issue of title is involved. Under the facts of this case both the mortgage and the assignment executed by John Franks in favor of THE BANK were accompanied by detailed exhibits which were made a part of said instruments. Each of these exhibits contained the specific provision that the lease of John Franks on property in the North Half of Section 32 had been pooled and unitized with other leases and the interest covered under both the mortgage and the assignment was fixed at 2.34375%, which was the identical interest allotted to John Franks under the provisions of the OPERATING AGREEMENT. It follows that THE BANK can rightfully claim only so much of the proceeds resulting as is allowed under the OPERATING AGREEMENT. The rights of THE BANK, as particularly delimited by the very instruments upon which it relies, have not, in any degree, been lessened nor impaired. THE BANK is entitled to exactly the proportionate interest, no more and no less, which was fixed and warranted by its debtor in the security mortgage and the assignment of proceeds.
For the reasons assigned the judgment appealed from is affirmed. Costs of this appeal are taxed against defendants-appellants.