HOOD, Judge.
Plaintiff, J. B. McDonald, instituted this action against The Grande Corporation and Magna Oil Corporation (the defendants later merging under the name of Magna Oil Corporation) to cancel an oil, gas and mineral lease affecting property owned by plaintiff, and for an accounting tof funds received from the production of gas from that land. Two other parties, Wilson El-lisor and John Economo, were impleaded as additional defendants prior to trial. Judgment on the merits was rendered by the trial court rejecting all of plaintiff’s demands. Plaintiff, J. B. McDonald, and one of the defendants, Wilson Ellisor, have appealed.
This is the second time we have had occasion to consider this suit. It was before us originally on appeal from a summary judgment rendered by the trial court on March 12, 1962, dismissing the suit at plaintiff’s costs. The only issues presented on that appeal were whether a genuine issue of material fact existed, and whether the mover was entitled to a judgment of dismissal as a matter of law. The majority concluded that in view of the favorable inferences which must be accorded to the opponent of a motion for summary judgment, the judgment appealed from at that time should be reversed and the case should be remanded for trial on its merits. The summary judgment of dismissal was reversed, therefore, and the case was remanded to the district court. See McDonald v. Grande Corporation, 148 So.2d 441 (La.App. 3d Cir. 1962, cert. denied 244 La. 128, 150 So.2d 588).
After the case was remanded, plaintiff amended his petition to implead the two other defendants hereinabove named and to allege an additional ground for cancellation of the lease. The case was consolidated for trial with a concursus proceeding which was *797 instituted by The Grande Corporation (now Magna Oil Corporation) about five weeks after the present suit was filed. The consolidated cases were then tried, and after trial a separate judgment was rendered in each action by the trial court. As already noted, judgment was rendered in the instant suit rejecting plaintiff’s demands, and plaintiff appealed.
The concursus proceeding which was consolidated with the instant suit related to production of gas from a well located on the McDonald land. Impleaded as defendants in that proceeding were McDonald and a number of other parties who claim an •interest in that production. In connection with that proceeding, Grande (or Magna) has deposited in the registry of the court sums of money which allegedly are sufficient to pay all of the royalties which have accrued from production under the McDonald lease. The judgment which was rendered in the concursus suit decreed that the lease from McDonald to the assignors of The Grande Corporation, and also the unit declaration which had been executed by Grande and other lessees affecting the McDonald land, were in full force and effect. The judgment fixed and set out the interests of the various parties in the production of gas from that land. McDonald appealed from that judgment. We are rendering judgment in both of these consolidated cases on this date. See Grande Corporation v. McDonald, 214 So.2d 808.
The facts were set out in the opinion rendered by a majority of this court when the case was before us originally on appeal from the summary judgment of dismissal. (See 148 So.2d 441). We have reviewed the record again, after trial of the case on its merits, and are convinced that the facts are correctly stated in our original opinion. We, therefore, refer to that opinion for an accurate statement of the facts as they existed up to the time of that appeal.
Reviewing briefly some of the pertinent facts, we find that on November 6, 1954, McDonald executed an oil, gas and mineral lease affecting his 24.07 acre tract of land in Iberia Parish, and that this lease was later assigned by the lessees to The Grande Corporation (now Magna Oil Corporation). The lease contained a voluntary pooling clause, giving to the lessee the right to pool any portion of the acreage covered by the lease with any other lands or leases in that immediate vicinity, provided that the pooling units so formed should not exceed 40 acres surrounding each oil well and 160 acres surrounding each gas or gas distillate well.
Pursuant to the provisions of that voluntary pooling clause, The Grande Corporation, on October 1, 1959, joined the lessees of other adjacent lands in formally creating or declaraing two pooling units. One of these units comprises 40 acres for the production of oil, and the other comprises 160 acres for the production of gas and gas condensate. The entire 40-acre unit was included within the boundaries of the 160-acre unit. A portion of the McDonald tract was included in the 40-acre oil unit, and substantially all of that tract was included in the 160-acre gas unit.
On October 21, 1959, an “operating agreement” was entered into by five lessees of property in that immediate vicinity, including Grande and Pan American Petroleum Corporation. In that contract, Pan American agreed to drill a well in search of oil or gas at a location within the 160-acre unit, and to operate the well if it was completed as a producer. All of the parties agreed to share, according to stipulated proportions, in the cost of drilling and operating the well, and in the production which might be obtained from it. In accordance with that agreement, Pan American drilled a well on property within the unit (not on the McDonald land), but it was abandoned as a dry hole on December 20, 1959. This well was known as the Landry No. 1 Well.
The McDonald lease, under its own terms, would have expired 90 days after *798 the abandonment of the Landry No. 1 Well, if operations for the drilling of another well had not been commenced within that time. After the first well had been abandoned, Grande was anxious to continue this lease in effect by commencing the drilling of another well within the 90-day delay, but the other parties to the operating agreement were unwilling to do so. After some negotiations, an agreement was entered into by all of said parties to the effect that the original operating agreement, dated October 21, 1959, was to be terminated, that all of the other parties were to assign to Grande their interests in the McDonald lease, and that Grande was to assign to the other parties all of its interest in the other leases (except the McDonald lease) which were included in the pooling unit. As evidence of this agreement the parties executed two documents which they designated as an “agreement” and an “assignment,” both dated March 7, 1960. These two documents are described more fully in the opinion which we rendered when this case was before us originally. See 148 So.2d 441, 447.
Grande, then, at its own expense, commenced the drilling of another well on the McDonald land within that 90 day delay, and that well was completed as a producing gas well on May 29, 1960. It was put on production on September 20, 1960, and it is known as the McDonald No. 1 Well. After the well began producing, Grande distributed division orders providing for the payment of royalties on the basis that the McDonald No. 1 Well was a “unit well.” McDonald objected, contending that the unit had been terminated before that well was drilled and that royalties must be paid on the basis that the well was a “lease well.” The parties were unable to reconcile their differences, and this suit was filed on December 9, 1960. The concursus proceeding which has been consolidated with this suit was filed by Grande on January 13, 1961.
Plaintiff contends primarily that he is entitled to judgment cancelling the oil, gas and mineral lease executed by McDonald on November 6, 1954. He contends that there has been an arbitrary misuse by the lessee, Grande, of the pooling power granted to it under the lease, that plaintiff has been prejudiced by Grande’s bad faith, that the misuse of that power constitutes a breach of the specific and implied conditions of the lease contract, and that plaintiff thus is entitled to have the lease cancelled.
McDonald takes the position that the completion of the Landry No. 1 Well as a dry hole proved that a portion of the 160-acre unit was nonproductive, that it then became disadvantageous for the McDonald land to remain in a unit with this unproductive property, and that an implied duty thus rested on Grande, as lessee, to attempt to extricate the lessor from his predicament and to eliminate the lessor’s land from that uneconomic unit. He contends that Grande had an opportunity to release the McDonald property from the unit at the time the “operating agreement” was terminated on March 7, 1960, but that Grande not only failed to do so but, on the contrary, it specifically contracted that royalties were to be paid out of production from the McDonald well on the basis that it was a “unit well,” all to the prejudice of the lessor, McDonald.
As pointed out by plaintiff, the “Assignment,” which was executed by Grande and other lessors on March 7, 1960, contains the following provision:
“It is further agreed by Assignee that, if Assignee elects to conduct such operations on the lease hereinabove described as will perpetuate the lease acreage of the parties hereto as to the units referred to in the preceding paragraph, it shall make such royalty payments to the lessors of unit acreage as will maintain the lease acreage included within the units, and to hold harmless the Assignor from any liability by reason of the failure of Assignee to so pay royalty as herein provided.”
*799 It is argued that Grande, by entering into that agreement, obligated itself, as lessee, to pay royalties to other landowners and royalty owners in the unit out of production from the McDonald well, but that it did not protect McDonald by exacting a similar agreement in favor of McDonald in the event production should be obtained from other lands in the unit. Plaintiff contends that Grande, in exercising the voluntary pooling power granted to it under the lease, was under a duty to act “with the good faith intention of serving the lessor-landowner’s interest,” that Grande acted in bad faith and to the detriment of the lessor, and that the lessor thus is entitled to have the lease cancelled.
The trial judge, after carefully analyzing all of the evidence, rejected these arguments of plaintiff. He concluded that Grande (or Magna) acted in good faith, that plaintiff’s interests were not overlooked by the lessee, and that the evidence fails to show that plaintiff sustained any injury as a result of Grande’s actions. Judgment thus was rendered rejecting plaintiff’s demands.
In his excellent written reasons for judgment, the trial judge has carefully and meticulously set out all of the relevant facts. Our review of the record convinces us that he has correctly analyzed the evidence, and we agree with the conclusions which he has drawn from the facts. We, therefore, adopt as our own opinion the following portions of the reasons for judgment which were assigned by the trial judge:
“The properties involved are located on the north flank of the Jefferson Island Salt Dome. Production in the area was first established by the Richardson No. 1 LeBlanc Well, which is located about 2700 feet west of the northern boundary of plaintiff’s property, and by the Richardson No. 1 Tra-han Well, which is located about 1500 feet southwest of plaintiff’s property in a declared unit that had been formed in October of 1958. The 160 acre unit in question, which was declared effective October 1, 1959, included the lands immediately to the east of the unit which had been developed by the Richardson No. 1 Trahan Well. All of the unit area had been made to appear potentially productive by the recent establishment of production in the above mentioned wells.
“The unit in question was formed pursuant to the terms and provisions of the various leases involved, which authorized voluntary pooling in order to properly develop and operate the properties so as to promote conservation or to comply with the spacing or unitization order of a regulatory body.
“About the same time, the Lessees of the pooled tracts entered into an ‘Operating Agreement’ for the purpose of producing oil and/or gas from the voluntary units they had created, and also to provide for the operation of said units for the joint account of said parties. In that instrument the parties agreed, among other things, as to their proportionate shares of the costs of drilling and other costs and expenses; as to their proportionate shares of the production; that each of the parties would be obliged to pay the royalty interests from its proportionate share of the production; that the agreement would remain in force and effect, unless sooner terminated by mutual agreement of the parties, for so long as the voluntary units exist, or, in the absence of additional drilling operations, at the expiration of ninety days from the date of plugging and abandoning of any well; that no additional wells would be drilled on the pooled area by any party without the mutual consent of all parties; that no lease covered by the agreement would be let to expire unless all the parties mutually consented thereto; and that in the event less than all the parties should elect to let any such lease expire, the party not consenting thereto would be entitled to require the other parties to assign to it all of their rights, titles and interests therein after having first given the said other parties notice of its intention not to let *800 said lease expire. Such agreements (that is, the unit agreement and the operating agreement) are customary in the industry and are designed to enhance and facilitate the development of areas that are composed of separately owned and leased small acreage tracts, such as were involved here.”
******
“The Landry Well was the first attempt to explore and develop the unitized acreage and under the operating agreement, Magna paid $21,655.98 for its share of the costs. The well was completed on December 20, 1959 and under the terms of its contract with plaintiff, Magna thus earned an additional ninety days (that is, until March 20, 1960) within which it could conduct additional operations to further maintain its lease.
“Meanwhile, the acreage lying immediately to the northwest of the unit had been pooled and the Richardson-Breaux & McDonald Well drilled thereon and completed as a producer on December 11, 1959. That well was located about 600 feet northwest of plaintiff’s 25 acre tract.
“Knowing that, Magna’s officers immediately began to contact the other Lessees in the unit for the purpose of drilling a second well on the unit area. This, of course, was consistent with Magna’s rights and obligations to develop its leased property. And knowing also that its lease would otherwise expire ninety days after the abandonment of the Landry Well, Magna gave formal notice to each of the other parties to .the operating agreement, as provided therein, of its election not to let its lease expire.”
* * * * * *
“When it appeared that the other Lessees in the Unit would not agree upon the drilling of another well on the unit acreage, Magna employed legal counsel in Louisiana for advice as to its legal position and as to what it might do and how it should approach protecting its interests. In the latter part of January, 1960, Mr. Chastain, of Magna’s Land Department, made two visits to this firm’s Lafayette Office where he related his Company’s problem and discussed it with Mr. Johnny Stewart, and obtained the latter’s advice verbally, and later by letter.”
* * * t- * *
“ * * * Mr. Stewart reported his opinion that the drilling of another well on Magna’s lease would preserve the unit, with the result that the other Lessees would share in the production, in the event it be obtained, while Magna would be taking all the risk. To avoid that result [the assumption of all the risk by Magna], Mr. Stewart recommended the execution of two instruments that he prepared for the dual purpose of terminating the operating agreement and so that Magna would be entitled to the full working interest production from the well it should drill at its own expense, which is what the operating agreement had provided in case the other lessees would be unwilling to do what was necessary to maintain the McDonald lease. He admonished, however, that the unit would continue to be in effect insofar as the Lessors whose lands were included in same, and that they would be entitled to share in the Lessors’ portion of the royalties produced from said well, since it was on the unit area.”
******
“Mr. Chastain called on plaintiff at his home and openly discussed his Company’s intentions of drilling another well and showed Mr. McDonald the location plat that had been prepared. Mr. Chastain tried to explain his Company’s understanding with reference to the unit — that if it drilled at the time (under the existing lease) this would maintain the unit, and he demonstrated Mr. McDonald’s interest in the unit on the reverse side of the well location plat. Mr. Chastain proposed to buy a new lease on the same acreage, explaining that his Company wanted additional time. He tried to explain how this might prove advantageous to Mr. McDonald by relating the advice his Company had received— *801 that if the present lease could be let to expire, the unit might then be dissolved.
“Mr. McDonald testified he could not remember why it was that he would not grant a new lease. The records show, however, that Mr. McDonald’s sons, who were also present, had wanted Mr. Chastain to also purchase a lease on some lands that they owned and that were located about two miles away, which the defendant did not want. Although the plaintiff and one of his sons disclaimed any knowledge of that it was later verified by another of the sons, who admitted that all were present when the discussion took place. His testimony shows that this was their habit; it was how they had leased their lands before.
“When Mr. Chastain did not succeed, he telephoned Mr. Howell in Dallas and reported what had transpired. Since it appeared useless to pursue the matter further, Mr. Howell put things in motion to commence drilling under the existing lease.”
* * ‡ * * ‡
“The instruments, with the insertions noted, were finally executed as of March 7, 1960. As noted before one merely terminated the operating agreement theretofore in effect. The other was an assignment whereby the other lessees in the unit transferred to Magna all of their interests in the McDonald lease, as well as any and all interest which they might have acquired in and to any oil, gas or other minerals that might be produced therefrom by virtue of the unit declaration in return for Magna assigning all interests it might have in and to all lease acreage of the assignors made subject to said unit declaration, but as noted before, all on the condition that Magna would agree that if it should conduct such operations on the McDonald lease as would perpetuate the leased acreage of all of said other parties as to said unit, it would make such royalty payments to the lessors of the unit acreage as would maintain the leased acreage included within said unit. Of course, it follows that as privy to the rights of the other lessees in the unit as to the McDonald lease, Magna would be legally obligated to discharge the royalty obligations owing by each such operator to their respective lessors as to production obtained from the lands covered by the McDonald lease and embraced in the unit area in the event the unit be maintained, as Magna had been advised it would. Correspondingly, the other lessees in the unit, as privy to the rights of Magna as to their leases, would be legally obligated to discharge the royalty obligations owing by Magna to its respective lessors as to production obtained from the lands covered by the other leases in the unit. Thus, when Magna made no efforts to secure an obligation from the other lessees in the unit to pay Mr. McDonald his proportion of royalties from their leased acreage in the unit, it did not overlook the interest of Mr. McDonald; it simply considered, and rightfully so, that such a provisions was unnecessary. Moreover, Magna knew that Mr. McDonald was going to have his royalties paid to him because the well was going to be drilled on his property, and such a provision would have served no useful purpose.”
J{< ‡ * :{« * '
“As Mr. Gandy [Vice President in charge of land and legal matters] explained, it made no sense for Magna to apply for a Commissioners Unit. When that possibility was considered in his office, he understood the geological evidence would be such that the unit might well exceed 160 acres, and he realized that this would not benefit either his Company or the royalty owners under its lease.”
* * * * * *
“In the latter connection, I refer to the testimony of Mr. Bates, who made an independent study of all the pertinent geological and engineering evidence then available and that would be necessary to advise the Court as to what the situation then appeared to be and as to what action then *802 would have been prudent from the stand-poing of an expert in such matters, not interested in what the outcome would be. The findings and reasoning which led to his conclusions will be discussed later. Suffice it to say here that Mr. Bates concluded that he, too, would not have advised applying for a Commissioner’s unit at any time prior to the date on which this suit was filed. Just as Mr. Howell had thought, Mr. Bates did not consider that there was enough geological and engineering data then available. And most important, he noted that the area that would then be considered potentially productive from the Magna-McDonald well exceeded 160 acres, and had a Commissioner’s Unit been requested, it might have turned out similar to the area that he had outlined as being potentially productive, in which event the McDonald interest would have been diluted.”

“Plaintiff complains that it was Magna which had gotten him and itself in the binding situation with respect to the unit, and he argues to the effect that Magna should not be allowed to take advantage of that situation to excuse its failure to extricate him from the consequences of its own dealings. The fallacy in that argument is that it begins with the notion that the ultimate result of Magna’s actions was bad, and from that premise, it concludes that Magna must be blamed for that result.
“In Southwest Gas Producing Company v. Creslenn Oil Company [La.App.] 181 So.2d 63 (writs refused) the Court recently considered the manner in which such agreements must be viewed. It noted that the motivation of such agreements is based on the prospects of loss as opposed to the hope of gain, and that they must not be regarded with hindsight, but rather as the parties looked at unknown and imponderable elements which lay outside the realm of ascertainable knowledge at the time the contracts were made.
“Also appropriate in judging the actions of Magna’s employees throughout their administration of the McDonald lease is the decision in Stanolind Oil & Gas Co. v. Sellers [10 Cir.] 174 F.2d 948. In that case, the plaintiff-lessor sought and obtained in the lower Court the cancellation of his lease on the grounds that the defendant-lessee had not acted as a prudent operator should have acted in developing the property and protecting it against drainage. On reversing that decision, the Appellate Court noted that the conclusions of bad faith or imprudent operations were based on factors which became known only after the time when the defendant-lessee was faced with the necessity of making its decisions, and it held that the evidence, based on subsequent events, was not competent to sustain the burden resting upon the plaintiff to establish bad faith and imprudent operations. The Court there stated the test to be not what a reasonably prudent operator would have done in the light of the subsequent facts, but what he would have done under the known existing circumstances at the particular period of the alleged breach — that his conduct is to be judged by foresight and not hindsight.
“Certainly it cannot be said that Magna in this case acted improperly when it joined in the unit declaration and the operating agreement and the drilling of the Landry well on the unit, for these were the customary means of carrying out the object of the lease. And all that Magna did after-wards was to acquire the working interests of the other operators in the unit so as to enhance its position to make another attempt to develop Magna’s leased acreage in the unit, which is one of the main considerations of the lease. See Saulters v. Sklar [La.App.] 158 So.2d 460 (writs refused [245 La. 638, 160 So.2d 227]). If the plaintiff’s position was changed in any way, it is only that he was placed in the position where he can now receive his part of the royalties, and this also is one of the main objects of the lease. See Melancon v. Texas Company, 230 La. 593, 80 So.2d 135, at page 142.
*803 “In Simmons v. Pure Oil Company, 241 La. 592, 129 So.2d 786, the plaintiff sued for cancellation of his lease on the ground that the lessee had subjugated his interests in favor of its own when it had made its application to the Commissioner of Conservation for the drilling of a well which later resulted in a revision of the existing units so as to eliminate some of the plaintiff’s leased acreage that had originally been included therein. The Court pointed out that allegations of bad faith pertaining to the lessee’s implied obligations under the lease contract are, in reality, a claim that the lessee had breached the lease by maladministration of the leased premises to the disadvantage of the lessor, in violation of La.Civ.Code Art. 2710. The Court further said that this type of fraud or misconduct does not, of itself, justify an annullment of the contract unless it is accompanied by a showing of loss or injury sustained by the party allegedly defrauded, and it held that the fact of such injury must be supported by well pleaded facts (which, of course, would have to be proven) and cannot rest upon mere conclusions based on speculation.
"There is no proof that the plaintiff was misled or that his interests were overlooked, nor is there any allegation or proof that he was injured in any way. What the plaintiff here has done is to rest his case entirely on argument drawn from hindsight and unsupported inferences — inferences such as were suggested by the Appellate Court and that were disproven by the explanatory evidence that has been produced.”
>|« iji ‡ % $
“The plaintiff here has utterly failed to carry that burden [of proving his case by a preponderance of the evidence] — he cannot recover on the basis of argument drawn from hindsight and unsupported inferences, standing alone.
“In the final analysis, the record shows that Magna bought its lease from plaintiff for valuable consideration and was the owner thereof when the McDonald No. 1 Well was drilled; that it thus had the right to drill this well and that the well was drilled under and within the terms of the lease; that it then timely attempted to pay the royalties on the production from the well in the customary manner and in accordance with the advice of legal counsel that the unit had thus been maintained, and that when a question arose, it diligently sought the advice of counsel and invoked a concursus proceeding and there deposited the maximum amount of royalties so that they could be paid to the rightful owners thereof. It is Magna’s position that under the cases cited, it makes no difference how the Court shall ultimately hold on the question of how the royalties should be paid— that under the circumstances above outlined, Magna did, nonetheless, maintain its lease and accordingly, it has the right to pay the royalties found to be legally due thereunder in accordance with whatever final judgment shall be rendered, either here or in the separate concursus proceeding.
“My conclusion is that the preponderance of the evidence clearly demonstrates that Magna acted in good faith and therefore its lease should be declared to be in full force and effect whether or not the units created as hereinabove stated are still in effect or not.”
As we have already noted, we agree with the factual and legal conclusions which were reached by the trial judge.
LSA-C.C. art. 2710 provides that “The lessee is bound: (1) To enjoy the thing leased as a good administrator, according to the use for which it was intended by the lease. (2) To pay the rent at the terms agreed on.” And article 2711 provides that “If the lessee makes another use of the thing than that for which it was intended, and if any loss is thereby sustained by the lessor, the latter may obtain the dissolution of the lease.”
The lease which is involved in this suit specifically provides that the lessee may pool the leased acreage with other *804 lands when “it is necessary or advisable to do so in order to properly develop and operate said premises.” But even in the absence of such a provision in the lease contract, our jurisprudence is established to the effect that there is an implied obligation in every mineral lease that the lessee will develop the leased premises for minerals with reasonable diligence for the mutual profit and advantage of both the lessor and the lessee: In determining whether the lessee has complied with this implied obligation all of the facts and circumstances in each case must be considered, including the question of whether further development of the lease is economically
feasible. Breaux v. Pan American Pet. Corp., 163 So.2d 406 (La.App.3d Cir.1964); Saulters v. Sklar, 158 So.2d 460 (La.App. 2d Cir.1963); Carter v. Arkansas Louisiana Gas Co., 213 La. 1028, 36 So.2d 26 (1948).
A lessor is entitled to cancellation of the lease for the lessee’s breach of an implied as well as an expressed covenant. Sohio Petroleum Co. v. Miller, 237 La. 1015, 112 So.2d 695 (1959). As we noted in our original opinion in this case (148 So.2d 441), we think a landowner-lessor may be entitled to the same relief for the arbitrary and unjustified misuse of the voluntary pooling powers granted to the lessee in the lease contract, provided that the lessee was not in good faith, that the misuse of those powers was unfair to the lessor and was contrary to the fundamental purpose for which the lease was granted, and that a loss was sustained by the lessor as a result of that misuse. See Williams, Oil and Gas Law, Vol. 4, Sec. 670.2, p. 83; Myers, The Law of Pooling and Unitization, Second Edition, Sec. 3.02, p. 81; Hoffman, Voluntary Pooling and Unitization, pp. 106-109; Sixteenth Annual Institute on Oil and Gas Law and Taxation, pp. 358-364.
The evidence in the instant suit, however, fails to establish that the lessee, Grande, has misused the pooling powers granted to it by the lease. We are convinced, as was the trial judge, that Grande has acted in good faith throughout this entire transaction, and that there has been no unfairness toward the landowner-lessor. Grande has not departed from the fundamental purpose for which the lease was granted by can-celling the original operating agreement, drilling the McDonald Well and contracting to pay royalties out of the production on the basis that it is a “unit well.” On the contrary, we think the lessee has exercised reasonable diligence in carrying out the fundamental purpose for which the lease was granted — to develop the leased premises for minerals for the mutual profit and advantage of both the lessor and the lessee.
We also agree with the trial judge that plaintiff has failed to show that he has sustained a loss by the actions of Grande. If Grande, by some means, had cancelled the voluntary pooling unit before the McDonald Well was drilled, it had the right before or after the completion of that well to create another such unit comprising the same number of acres, even though the area around the abandoned Landry Well should not be included. If that should have occurred, then McDonald would receive the same royalties he otherwise would have been entitled to receive and thus no loss would have been sustained. If Grande had not joined in cancelling the operating agreement but had proceeded to drill the McDonald Well, with that agreement still in effect, plaintiff would have been entitled to no more royalties than he now is entitled to receive. And, if a Commissioner’s unit should have been formed, the expert testimony indicates that McDonald’s interest may be less, instead of more, than it is at present.
McDonald urges as an additional ground for cancellation of the lease that Grande has failed to pay the royalties due under that lease, and particularly that it has failed to pay McDonald the minimum amount which Grande acknowledges it owes *805 the lessor as royalties. The evidence convinces us, as it did the trial judge, that Grande in good faith has endeavored to pay the royalties due without delay. When a dispute arose as to the persons to whom payments should be made, Grande promptly instituted a concursus proceeding and in connection with that proceeding it has deposited all royalties which may be due in the registry of the court. We find no breach of the lease contract in that respect.
Our conclusion is that the evidence fails to show that plaintiff is entitled to the relief which he seeks in the instant suit. We thus affirm the judgment of the trial court rejecting plaintiff’s demands and dismissing this suit.
In the companion suit, McDonald contends alternatively that even though the lease may still be in effect, the pooling unit has been terminated and the McDonald Well thus must be regarded as a “lease well” instead of as a “unit well.”
The pooling clause of the lease provides that “any unit formed by Lessees hereunder may be created either prior to the drilling or after the completion of the unit well.” McDonald argues that the term “the unit well,” being singular, indicates that a unit created under the pooling clause of the lease is formed for the drilling of only one well, and that the unit terminated and ceased to exist when that well, the Landry Well, was completed.
We think the term “the unit well,” considered with other provisions of the pooling clause, means a producing well. It does not mean that only one attempt to locate and produce oil or gas may be made, and that if the first attempt is unsuccessful then the unit must be held to have terminated. It is not necessary for us to determine whether more than one producing well may be located on one unit, because that question is not before us. We do hold, however, that in the instant suit the unsuccessful completion and abandonment of the Landry No. 1 Well did not have the effect of terminating the pooling unit which had been created prior to the drilling of that well. The pooling unit was still in effect, therefore, when the McDonald Well was drilled and completed.
McDonald argues further that the unit terminated when the purposes for which it was created ceased to exist. He correctly points out that the lease authorizes the lessee to create pooling units “to promote the conservation of oil, gas or other minerals.” And, he notes that the unit declarations executed by Grande and other lessors specifically stipulate that the units were created “to provide maximum conservation, and to insure to each of the parties hereto its fair share of the gas and gas condensate produced from the unitized property.” He argues that the inclusion in a pooling unit or acreage which has been proved to be nonproductive cannot be said to promote the conservation of oil, gas or other minerals or to insure to McDonald that he will receive his fair share of the production from the unit well. He contends, therefore, that the purpose of the unit ceased to exist when the Landry Well was abandoned, and that the unit thereupon fell.
This argument was presented when the case was before us originally on appeal from the summary judgment of dismissal. (See 148 So.2d 441). The majority held then that “it is probable that he would not be entitled to the relief sought, since we could not say that the lessee acted in clear violation of the terms of the lease.” We have reconsidered that argument, now that the case has been tried on its merits, and we have concluded, consistent with our original impression, that plaintiff is not entitled to the relief which he seeks.
We think the trial judge has correctly disposed of this issue, and we adopt as our own the following additional portion of his reasons for judgment:
“There is no evidence — geological,. engineering or otherwise — to support the con- *806 elusion that at some particular time this unit became inappropriate to serve its original intended purpose. The evidence further shows the inequities that would result to the other owners of the productive acreage in the unit if, on that account, they should be altogether eliminated from participating in the production that has been established.
“When it comes to the business of adjusting the equities so that each landowner would receive a share of the production based on what his property actually contributes to the particular well involved, it is apparent that the only equitable solution would be a modification or a revision of the unit. Mr. Wharton [a consulting petroleum geologist] recognized this to be so when, after opining that the unit would not be appropriate for the McDonald well, he nonetheless made it clear that a unit should be retained.
“In this State there is an administrative remedy for the modification or reformation of units, such as here involved. Again, Mr. Wharton’s testimony shows that this is how such matters are customarily handled in Louisiana. And that obviously is what the lessors had in mind when they agreed that their lessees ‘may also reform any unit to conform with an order of a Regulatory Body issued after said unit was originally established.’ But the leases do not contemplate a modification or revision of the unit by any other means.
“When the plaintiff here uses his hindsight and argues that the interest of the parties would be better served without a unit, not only does he overlook the inequities that would result to the other owners of the productive acreage in the unit, but he employs false legal standards, as well.
“The Louisiana Revised Civil Code provides as follows:
“ ‘Art. 1775. Considered in relation to their effects, contracts are either certain or aleatory.’
“ ‘Art. 1776. A contract is aleatory or hazardous, when the performance of that which is one of its objects, depends on an uncertain event.
“ ‘It is certain, when the thing to be done is supposed to depend on the will of the party, or when in the usual course of events it must happen in the manner stipulated.’
“ ‘Art. 2982. The aleatory contract is a mutual agreement, of which the effects, with respect both to the advantages and losses, whether to all the parties or to one or more of them, depend on an uncertain event.’ ”
The enforcement of such contracts cannot be avoided on the grounds of lesion, the chances of loss being of the essence in that kind of contract and compensated by the chances of gain. Planiol, Traite Elemen-taire (an English translation), Vol. 2, 954-958. Various applications of that principle can be found in the following Louisiana cases: Henderson v. Stone, 1 Martin (N. S.) 639; Moore v. Johnson [Johnston] 8 La.Ann. 488; Thielman v. Gahlman, 119 La. 350 [44 So. 123]; Southwest Gas Producing Company v. Creslenn Oil Company [La.App.], 181 So.2d 63, writ refused February 4, 1966.
“In the Creslenn case, supra, the Court considered an operating agreement, which is similar to what is involved here. We previously cited that case to show that the motivation of such agreements is based on the prospects of loss as opposed to the hope of gain, and that they must not be regarded with hindsight, but rather, as the parties looked at unknown and imponderable elements which lay outside the realm of ascertainable knowledge at the time the contracts were made. The Court also considered the question of how such contracts must be enforced, and it held that so long as the elements of error or fraud are not involved, it is the purpose of the law to enforce such agreements without concern as to the disproportionate advantages which may ultimately result. (181 So.2d at page 68).
*807 “In the case at hand, there could be no way of knowing what amount each tract would contribute to the production, if any, that would be obtained until after the unit acreage would be fully developed. That was one of the uncertainties that the parties faced when they agreed to pool their respective tracts and to share in any production on the basis of the number of surface acres contributed by each. By that agreement, the Landrys, on whose tract the first well was drilled, gave up the full royalty interest in their tract for a lesser interest in the 160 acre unit. The plaintiff, whose tract was farthest removed from where the Pan Am — Landry Well was to be drilled, took a lesser interest under his tract for an interest throughout the entire 160 acre unit. This was an aleatory contract sanctioned by law.
“This is not to say that the lessors here involved had intended, by their lease contracts, to so freeze their interests that they could not subsequently be modified by the establishment of a Commissioner’s unit or units. On the contrary, as above noted they had provided for the eventuality. But until such a revision comes about, the agreement must be enforced in accordance with the terms there provided and, as said in the Creslenn case, without concern as to the disproportionate advantages which may ultimately result. That is what all the cases on the subject hold.”
We are in accord with the above quoted views which were expressed by the trial judge.
In addition to the reasons assigned by the trial court, and with which we agree, we think it appropriate to observe that two expert petroleum geologists testified at the trial. Mr. Jay B. Wharton, Jr., the geologist called by McDonald, testified that in his opinion the formations found in drilling the Landry Well establish that the south part of the Declared Unit is unproductive, but he states that “it might be a rather small portion; possibly the southeast corner of the unit.” As we understand his testimony, he limited his investigation only to the sand from which the McDonald Well was producing. The Unit Declaration, of course, does not restrict the unit to any particular sand. Mr. Fred W. Bates, a geologist called by Grande, does not feel that the Landry Well condemns any part of the 160-acre declared unit. In his opinion the area south of the Landry Well is “potentially productive in shallower zones,” and the area north of that well “still remains potentially productive in the McDonald and Trahan sands.” He testified that the McDonald Well “must in fact be draining an area considerably larger than the 160 acres included within the Declared Unit.”
The trial judge apparently accepted the opinion expressed by the experts called by Grande since he concluded that there was no evidence to support the conclusion that the unit became inappropriate to serve its original intended purpose. We cannot say that the trial judge erred in arriving at that conclusion. We agree, therefore, that the evidence fails to show that a portion of the declared unit was unproductive or that the unit at any time ceased to serve the purpose for which it was created.
We agree with the trial judge that the pooling unit which was created on October 1, 1959, by the joint agreement of Grande and other lessors, remains in full force and effect, and that royalties payable out of production from the McDonald Well must be computed on the basis that it is a “unit well.”
For the reasons herein set out, we are rendering judgment in the companion suit affirming the judgment of the trial court.
The judgment appealed from in the instant suit is hereby affirmed. The costs of this appeal are assessed to the appellants, J. B. McDonald and Wilson Ellisor.
Affirmed.