148 So.2d 441 (1962)
J. B. McDONALD, Plaintiff-Appellant,
v.
The GRANDE CORPORATION et al., Defendants-Appellees.
No. 646.
Court of Appeal of Louisiana, Third Circuit.
December 18, 1962.
Rehearing Denied January 24, 1963.
Certiorari Denied March 15, 1963.
*442 Duncan M. Smith, Jr., Lafayette, for plaintiff-appellant.
Landry, Watkins, Cousin & Bonin, By Jack J. Cousin, New Iberia, for defendants-appellees.
Before TATE, SAVOY, and HOOD, JJ.
TATE, Judge.
This is an action by a landowner to cancel a mineral lease. Made defendants are The Grande Corporation ("Grande") and its subsidiary, the Magna Oil Corporation, who acquired this lease by assignment and are the present owners of the lease working interest, and who hereinafter will sometimes be referred to as "lessee".
*443 The District Court sustained the defendants' motion for a summary judgment. The plaintiff landowner appeals from the consequent summary judgment dismissing his suit.
Pursuant to voluntary pooling clauses in the leases granted by the landowners, Grande and lessees of adjacent tracts had formed a 160-acre unit, which included the plaintiff McDonald's 24-acre tract. Initially, an unsuccessful well was drilled on the tract of a third party also included within the unit. Subsequent to this "dry hole", Grande then drilled a second well, this time on the McDonald tract. This second drilling successfully resulted in the completion of a producing gas well.
McDonald's demand for cancellation of the mineral lease is based upon Grande's alleged bad faith in refusing to pay him the entire royalty interest due from the production of this well. The plaintiff McDonald contends that he is entitled to receive all the royalties from this well drilled on his land and that the royalties from this second well should not be allocated pursuant to the previously formed 160-acre unit, because the drilling of the first well definitely proved that a portion of the acreage included within the former unit was non-productive. Also, the plaintiff contends, this second well was drilled after the unit had been terminated by the mineral lessees of all the tracts included within it.
I. Procedural context of our ruling.
At this point, we must emphasize that the sole issue raised before us by the plaintiff's appeal is whether a summary judgment of dismissal should have been granted on the basis of the pleadings and of the stipulations, affidavits, and copies of documents introduced for the limited purpose of trying the motion for summary judgment.
The motion for summary judgment is authorized by Articles 966 through 968 of the Louisiana Code of Civil Procedure of 1960. These provide that, upon motion and after hearing, a summary judgment "shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law," LSA-C.C.P. Art. 966.
However, summary judgment, which deprives a litigant of a trial on the merits, is not a substitute for such a trial; it is not to be made use of when there is a genuine issue of fact to be resolved; further, the mover for a summary judgment has the burden of clearly proving the absence of any genuine issue as to material fact, and all reasonable doubts must be resolved against the mover. Touchet v. Firemen's Insurance Co., La.App. 3 Cir., 146 So.2d 441; Walmsley v. Gilmore, La.App. 4 Cir., 144 So.2d 625; Jacobs v. Beck, La.App. 4 Cir., 141 So.2d 920; Snell v. Intercoastal Airways, Inc., La.App. 4 Cir., 139 So.2d 70.
The narrow issue before us is whether the movers for the summary judgment have sustained their burden of proving that they are clearly entitled to this summary remedy. We have reviewed the evidence in this record for the limited purpose of deciding this narrow issue. We have concluded that, viewed for this limited purpose only, the evidence does not so clearly exclude the plaintiff's right to the relief demanded by this suit, as to entitle the defendants to a summary judgment dismissing it.
II. Facts.
The following pertinent facts are shown by the documentary evidence produced for the trial of the motion for summary judgment:
In 1954, McDonald, the plaintiff lessor, granted a mineral lease covering his 24-acre tract. Grande subsequently acquired this lease.
This lease contained a voluntary pooling clause which gave the lessee, at its option, the right to pool, for purposes of mineral development and operation, any portion of the acreage covered by the lease with any *444 other land in the vicinity, without securing any further approval of the landowner-lessor.
On October 1, 1959, pursuant to this lease authorization, Grande, together with mineral lessees of adjoining acreage, executed a unit declaration pooling 160 acres in order to obtain the greatest ultimate recovery of gas and gas condensate. This declared unit embraced 24.07 acres of McDonald's land and 135.93 acres of land in five immediately adjacent tracts covered by leases owned by other lessees. (See Exhibit I below.)
 Grande and these other lessees entered into a joint operating agreement, naming one of the lessees (Pan American) as operator. Pursuant to this agreement, Pan American drilled a well in search of gas. It was abandoned as a dry hole on December 20, 1959. This well, designated as Landry No. 1, was located within the unitized area. It was not, however, on the McDonald tract. (See Exhibit I).
*445 On March 7, 1960, the lessee terminated the joint operating agreement, and all of them assigned to the Grande Corporation any interest in the McDonald lease which they had acquired by virtue of the pooling agreement.
On or after March 8, 1960 (the day following the termination of the joint operating agreement), the defendant Grande commenced drilling a gas and gas condensate well. On September 20, 1960, Grande formally placed this gas well on production. (According to the briefs, the well was successfully completed on or about May 29, 1960.) This well is denoted as J. B. McDonald No. 1. (See Exhibit I.)
Basically, the position of the plaintiff landowner is that this successful well, J. B. McDonald No. 1, was drilled on his tract by the mineral lessee after the original 160-acre unit was terminated, either by the abandonment of Landry No. 1 as a dry hole, or by the joint agreement of the mineral lessees who had initially created the 160-acre unit. The plaintiff contends that, therefore, the royalty owners of the McDonald tract are entitled to receive all the mineral royalties due because of production on the McDonald tractthat is, that McDonald No. 1 was a "lease well"[1], as distinguished from a "unit well".[2]
The plaintiff McDonald bases his demand for cancellation upon the circumstance that Grande actively violated the lease by refusing to pay him royalty from McDonald No. 1 on a "lease well" basis, despite his formal demand for payment upon such basis. The facts upon which this claim of active violation is based are as follows:
On November 7, 1960, Grande commenced to circulate division orders showing the royalties payable to the royalty owners on all the tracts within the unit on the basis that McDonald No. 1 was a "unit well", not a "lease well". These same division orders show, however, that Grande and its subsidiary were to receive the entire working interest, just as if J. B. McDonald No. 1 was a "lease well"that is, the production allocable to the working interest was entirely allocated to Grande and its subsidiary, without being divided among the mineral lessees of the other tracts formerly included within the 160-acre unit.
On November 17, 1960, the plaintiff, through his attorney, wrote Grande formally notifying this lessee that its failure to acknowledge that the unit of October 1, 1959 had terminated would place its lease in jeopardy. The attorney noted that, since the unsuccessful drilling of Landry No. 1 had proved a large portion of the declared unit to be non-productive, such unit could not be used as the basis for the payment of royalties.
The attorney further stated that "all of the working interest credited to this well is retained by you and those holding under you. It is impossible for you to contend that the unit declared in October, 1959, is still effective for the purpose of making royalty payments, but it is not effective for the purpose of making working interest payments."
Grande did not reply to this letter. Accordingly, on December 9, 1960, the plaintiff instituted this suit demanding cancellation of the lease, alleging that the defendants had actively breached and violated the terms of the lease granted to them by the plaintiff McDonald by refusing to pay him the full one-eighth of the market value of the gas sold from the well (the required *446 royalty rental under the terms of the lease).[3]
In dismissing the present suit, the trial court agreed with the defendants' contention that, even if the circulation of the division order contains an erroneous allocation of the landowners' royalties (which lessee denies), such action does not constitute a violation such as would entitle the lessor to cancellation of the lease. The trial court concluded that Grande was not arbitrary and was acting in good faith, even though it should ultimately be held that the plaintiff was entitled to receive royalties on a "lease well" rather than a "unit well" basis, because the opposing contentions of the parties stem from an as yet unsettled question of law, namely, whether a declared unit is terminated when the first unit well drilled is unsuccessful and definitely proves that part of the acreage included within the unit is unsuccessful.
III. Termination or dissolution of the unit.
The plaintiff lessor contends that the unit created unilaterally by the lessees terminated as soon as the purposes fell for which it was formed, which included the purpose of insuring "to each of the parties hereto its fair share of the gas and gas condensates produced from the unitized property." Unitization agreement of October 1, 1959, Tr. 42. Since a large portion of the unitized tract was found to be non-productive through the unsuccessful drilling of Landry No. 1, the plaintiff lessor strongly argues that, upon this finding, then the unit fell, since to retain the unit after it was proved that unproductive acreage was included within it, would defeat "the very purpose for which a lessor signs an individual lease contract with his lessee with a pooling agreement therein [,which] is for the purpose of getting his equitable and just share of oil and gas in the pool and to prevent drainage of his land." Humble Oil & Refining Co. v. Jones, La.App. 3 Cir., 125 So.2d 640, 647[4], reversed on other grounds, 241 La. 661, 130 So.2d 408.
The plaintiff also relies upon authorities to the effect that voluntary pooling provisions exercisable at the option of the lessee only must be strictly construed and that the rights granted thereunder must be exercised in good faith, and to the effect that this requirement of good faith cannot be found to exist where the lessee attempts to create a unit containing acreage which has theretofore been proven un-productive.
Nevertheless, if this were the sole basis of the plaintiff's demand for cancellation, it is probable that he would not be entitled to the relief sought, since we could not say that the lessee acted in clear violation of the terms of the lease. Rudnick v. Union Producing Co., 209 La. 943, 25 So.2d 906; Bonsall v. Humble Oil & Refining Co., D.C.W.D.La., 201 F.Supp. 516, affirmed 5 Cir., 300 F.2d 150, 1962. For, although creation of a unit with proven unproductive acreage may be invalid from its inception, the jurisprudence is still unsettled concerning *447 whether a contractual unit is diminished or terminated when it is subsequently discovered that some of the acreage originally included is unproductive. Cf. e. g., Humble Oil & Refining Co. v. Jones, above cited; Breaux, Mineral LeaseVoluntary Pooling Clause, 10 Loyola L.Rev. 224 (1961); Hoffman, Voluntary Pooling and Unitization (1954) pp. 124-130; Myers, The Law of Pooling and Unitization (1957), Sections 14.07 (p. 390), 14.08 (p. 395).
However, in addition to the contention that the drilling of the dry hole ipso facto terminated the voluntary unit, it is further contended that Grande was arbitrary in not tendering the plaintiff royalties on the basis that McDonald # 1 was a "lease" well, because Grande itself construed the unit as having been terminated by allocating to itself and its subsidiary the entire production allocable to the working interest.
Grande does not deny that this was done. However, in the trial of the motion for summary judgment, it introduced into evidence certain unrecorded instruments executed by it and by the other mineral lessees who had formed the unit. It is by virtue of these instruments that Grande and its assigns received the entire production allocable for the mineral interest.
These instruments are an "agreement" and an "assignment", both dated March 7, 1960. By these instruments, the five lessees who had created the 160-acre unit on October 1, 1960, specifically terminated the operating agreement of October 19, 1960 entered into to effectuate production from the unit so created. By these instruments, all the other lessees declared that they had no further interest in the McDonald mineral lease held by Grande, or in any minerals that may be produced therefrom, and they relinquished any interest they may have obtained in the minerals of the McDonald tract as a result of the unit declaration of October 1, 1959.
On its part, Grande, in consideration of such assignment and release, itself assigned to the other lessees any interest Grande may have acquired in and to the acreage of the other lessees by virtue of the unit declaration of October 1, 1959.
On the basis of these instruments, there is of course no doubt that the previously declared unit was voluntarily terminated insofar as Grande, on the one hand, and the other lessees, on the other, were concerned. Grande could drill on the McDonald tract without sharing the working interest production with the other lessees; the latter lessees could drill on their own leased tracts without sharing with Grande any production resulting therefrom.
In arguing that, nevertheless, the unit was not terminated insofar as the land-owner-lessors were concerned, Grande relies upon a clause in the agreement of March 7, 1960 by which Grande agreed that, if Grande "elects to conduct such operations on the lease hereinabove described as will perpetuate the lease acreage of the parties hereto as to the units [created on October 1, 1959] referred to in the preceding paragraph, it shall make such royalty payments to the lessors of unit acreage as will maintain the lease acreage included within the units, and to hold harmless the assignor [the other lessees] from any liability by reason of the failure of assignee [Grande] to so pay royalty as herein provided".
Weighing this contention by the defendant in the light of the defendant's burden as mover for a summary judgment, it could well be argued that by this contractual agreement Grande obligated itself to make royalty payments owed by the other lessees only if the drilling operations were such as did as a matter of law perpetuate the unit; although, insofar as Grande and the other lessees were concerned, they had done all possible to terminate the unit. If, on the other hand, this clause does represent a binding agreement by Grande to pay the royalties owed by the other lessees on the basis that the McDonald well as a "unit well" (whether or not it actually was so as a matter of law), then it is noteworthy that *448 the other lessees exacted Grande's promise to pay royalties to their landowner-lessors whose acreage was included within the unit, in the event that Grande obtained production from the McDonald tract; but that there is no showing that Grande attempted to protect its own landowner-lessor by exacting a similar agreement in the event that the other lessees obtained production on their tracts.
Thus, construing the documentary evidence against the mover for summary judgment, Grande obtained a termination of the unit insofar as itself was concerned, under which Grande was to obtain for itself the entire working interest production from the McDonald tract. If this action did not by itself result in the dissolution of the unit, then so far as the abbreviated record shows, Grande did not obtain for its own landowner-lessor whatever benefits it had secured for itself by the termination of the unit as to the mineral lessees.
Perhaps, in that latter case, it may be argued that Grande wished to preserve for its own landowner-lessor the hypothetical benefit of sharing in whatever production might result from the other tracts in the unit (including the proven dry acreage), and therefore did not attempt to obtain the dissolution of the unit as to royalty owners (although without affording its landowner-lessor opportunity for the same choice Grande exercised in its own interest). Nevertheless we note that Grande apparently did not feel that sharing in the production from other tracts was so beneficial a right as to retain it for itself.
The plaintiff thus contends that Grande breached a duty to its landowner-lessee either by refusing to pay full royalties due him as a result of its own previous dissolution of the unit; or else by failing to extricate its own landowner-lessor, when it extricated itself, from an uneconomic unit which had been previously formed by Grande pursuant to its delegated power under the voluntary pooling clause.
It is to be remembered that the original 160-acre pool was formed unilaterally by the lessees, without obtaining any further consent from their lessors, pursuant to a voluntary pooling clause contained in the leases. See Appendix I for pertinent wording of this voluntary pooling clause.
By this clause, each lessor granted his lessee the right to pool and unitize his leased tract "in order to properly develop and operate said premises so as to promote the conservation of oil, gas or other minerals in and under and that may be produced from said premises * * *."
In interpreting the purpose and the extent of authority conferred by a lease with such a voluntary pooling clause, our Supreme Court stated in Mallett v. Union Oil and Gas Corporation, 232 La. 157, 94 So.2d 16, 17:
"Under the terms of the lease involved in this case, the lessee is granted the right to go upon the property of the plaintiff to investigate, explore, prospect, drill, and mine for minerals. In other words, the lessee is granted the right to go upon the property and develop it in order to secure minerals. The purpose of the lease being such, any pooling agreement provided for therein must be considered as incidental to and an aid in carrying out that purpose unless there is clear and unmistakable language contained therein to the contrary. * * * The contract must be construed against the lessee for he either prepares the lease or furnishes the prepared form."
In the cited Mallett decision, the mineral lessee had improperly sought to use the pooling clause to extend the lease beyond its primary term. When the landowner-lessor refused to extend the lease which had been granted in 1950, the mineral lessee in 1955 pooled a portion of its acreage with producing property just three days before the lease otherwise would have expired. Our Supreme Court held that pooling for such purposes was void as not within the intended purpose for which the landowner-lessor *449 had granted it. See also Union Oil Co. of California v. Touchet, 229 La. 316, 86 So. 2d 50, and Wilcox v. Shell Oil Co., 226 La. 417, 76 So.2d 416, to the effect that courts strictly construe the pooling power granted by the lease to the mineral lessee.
As indicated by the cited cases, the jurisprudence in Louisiana and in other states interprets the powers granted the lessee by a voluntary pooling clause as subject to such restrictions as will prevent arbitrary and unfair dealings and as will therefore enforce a "standard of good faith" on the part of the mineral lessee. Hoffman, Voluntary Pooling and Unitization (1954) 97, 106-109. (Chapter 3 of this treatise contains an extensive discussion of the type of voluntary lease pooling clause here under discussion.)
Thus, in exercising the broad powers granted to a mineral lessee by a lease, the mineral lessee is under the duty to exercise them in accordance with the fundamental purpose for which they were granted to him by the lessor-landowner, which is to secure the greatest possible ultimate return to the landowner from the mineral development of his land. The mineral lessee must therefore act in connection with the voluntary pooling power with the good faith intention of serving the lessor-landowner's interest or, at the very least, the mineral lessee must not act in connection with such pooling power to the detriment of the lessor-landowner's interest, since in pooling the lessor-landowner's land, the lessee is acting virtually as the former's agent as well as for itself. See Hoffman, above cited, at pp. 104-108.
This duty of the mineral lessees is similar to the implied obligations which the courts have found to be imposed as additional duties upon mineral lessees besides those expressly stipulated in the lease. (Merrill, Covenants Implied in Oil and Gas Leases (2d ed. 1940); Brown, The Law of Oil and Gas Leases (1958), Chapter 16; 2 Summers, The Law of Oil and Gas, Section 375 (1959 ed.); Moses, The Effect of Louisiana's Conservation Statute on the Doctrine of Implied Covenants in Oil and Gas Leases, 27 Tul.L.Rev. 313 (1953); Walker, Implied Drilling Obligations in Oil and Gas Leases in Louisiana, 1 Loyola L.Rev. 1 (1941); Meyers, The Effect on Implied Covenants of Conservation Laws and Practices, 4 Rocky Mountain Min. Law Inst., 463, 513 (1958).
A lessor is entitled to cancellation of the lease for the lessee's breach of an implied as well as of an expressed covenant. Merrill, above-cited, Section 160, p. 362; Brown, above-cited, Section 16.03(1) T, p. 322; Sohio Petroleum Co. v. Miller, 237 La. 1015, 112 So.2d 695; Wier v. Grubb, 228 La. 254, 82 So.2d 1; Carter v. Arkansas La. Gas. Co., 213 La. 1028, 36 So.2d 26. We see no reason why a landowner-lessor should not be entitled to the same relief for the arbitrary misuse, to its prejudice, of the power granted to a mineral lessee by the voluntary pooling clause of a lease.
It is true that the breach of an implied covenant is regarded as a "passive" breach, which requires that the lessee be put in default before the lease is cancelled because of the violation of such covenant. Brown v. Sugar Creek Syndicate, 195 La. 865, 197 So. 583; Hiller v. Humphreys Carbon Co., 165 La. 370, 115 So. 623; Pipes v. Payne, 156 La. 791, 101 So. 144.
We believe this requirement to be satisfied in the present instance by McDonald's demand, before institution of this suit, for the payment to him of the royalty interest on the basis that McDonald No. 1 was a "lease well". Compliance with this demand would have restored the landowner-lessor to the position in which he was entitled to be, if Grande had acted in connection with the exercise of the powers granted to it by the voluntary pooling clause of the lease, with a proper regard for its own landowner-lessor's interests.
We have therefore concluded that the summary judgment should be reversed, *450 and that this suit should be remanded for further proceedings not inconsistent with these views.
It is well, however, to emphasize again that we have evaluated the limited evidence produced for the trial of the motion of summary judgment, in relation to the burden placed upon the mover therefor to prove clearly that he is entitled to such relief. Because of the limited nature of our ruling herein, we do not intend to foreclose a contrary conclusion by the trial court upon the trial to the merits between the parties, if, upon full production of explanatory and amplifying evidence (and without the benefit of favorable inferences accorded to the opponent to a motion for summary judgment), the plaintiff is not able to prove by a preponderance of the evidence that he is entitled to the relief sought.
IV. Related causes of action.
In the oral argument it was additionally suggested that the landowner-lessor may also be entitled to cancellation of the lease because of the unreasonable failure of the mineral lessee to pay or tender shut-in or other royalties between the date the well was successfully completed in May and the date royalties were first tendered in November, 1960. Bollinger v. Texas Company, 232 La. 637, 95 So.2d 132; Melancon v. Texas Company, 230 La. 593, 89 So.2d 135; Pierce v. Atlantic Refining Company, La.App. 3 Cir., 140 So.2d 19 certiorari denied. As the defendant-appellee noted, however, there is some question whether this issue is properly raised by the pleadings.
In such situations, the recent jurisprudence permits the amendment of the plaintiff's petition on the remand to permit other allegations of facts stating additional but closely related causes of action for the same basic demand (cancellation of the lease). Seale v. Stephens, 210 La. 1068, 29 So.2d 65; St. Cyr v. Poche, La.App. 1 Cir., 110 So.2d 140; Dupre v. Consolidated Underwriters, La.App. 1 Cir., 99 So.2d 522.
V. Other exceptions urged by the defendant-appellee.
Several exceptions filed by the defendant were heard on the same date as the motion for summary judgment. Having reached the conclusion that the suit should be dismissed by summary judgment, the trial court did not rule upon these exceptions. The plaintiff alone appealed from judgment dismissing his suit.
Although Grande did not answer the appeal to pray that we rule upon these exceptions, nevertheless, its able counsel argues, in the alternative to a request for the affirmance of the trial court, that we should sustain certain of the exceptions, particularly those based upon non-joinder of necessary or indispensable parties.
We pretermit discussion of whether exceptions not ruled upon by the trial court are before the appellate court for review, in the absence of an answer by the defendant-appellee to the appeal by the plaintiff-appellant for judgment dismissing his suit. See LSA-C.C.P. Art. 2133, especially annotation headings 9 and 10 thereunder in 5 West's LSA-C.C.P.; but see also LSA-C.C.P. Art. 927.
For, in any event, as a matter of general practice, in instances when appellate courts reverse a trial court judgment and remand the case for further proceedings below, they will not rule on issues or exceptions which were not passed on by the trial court and which it is not necessary for the appellate court to rule upon in order to dispose of the appeal. Tracy v. Dufrene, 240 La. 232, 121 So.2d 843; State ex rel. Boucher v. Heard, 228 La. 1078, 84 So.2d 827; Durmeyer v. Streiffer, 215 La. 585, 41 So.2d 226; State ex rel. Jones v. Edwards, 203 La. 1039, 14 So.2d 829. We see no reason to depart from this practice in the present appeal.

Decree.
For the foregoing reasons, the summary judgment dismissing the plaintiff's suit is *451 reversed, and this case is remanded for further proceedings below not inconsistent with the views herein expressed. The defendants-appellees are taxed with the costs of this appeal; other costs to await the final outcome of this litigation.
Reversed and remanded.
HOOD, J., dissents, being of the opinion that the judgment of the trial court is correct and should be affirmed.

APPENDIX I.
The lease in question was on a standard printed commercial lease form designated as "Bath Form 42 CPM-New South Louisiana Revised Four (4)Pooling". The pooling clause is contained at paragraph 2 of the lease and pertinently provides as follows:
"Lessee, at its option, is hereby given the right and power without any further approval from Lessor to pool or combine the acreage, royalty, or mineral interest covered by this lease, or any portion thereof, with other land, lease or leases, royalty or mineral interests in the immediate vicinity thereof, when, in Lessee's judgment, it is necessary or advisable to do so in order to properly develop and operate said premises so as to promote the conservation of oil, gas or other minerals in and under and that may be produced from said premises or to comply with the spacing or unitization order of any Regulatory Body of the State of Louisiana or the United States having jurisdiction. * * * Any unit formed by Lessee hereunder may be created either prior to the drilling or after the completion of the unit well; and separate units may be created for oil and/or gas even though the areas thereof overlap. Lessee shall have the right and power to reduce and diminish the extent of any unit created under the terms of this paragraph so as to eliminate from said unit any acreage or lease upon which there is or may be an adverse claim; and Lessee may also re-form any unit to conform with an order of a Regulatory Body issued after said unit was originally established. Such revision of the unit shall be evidenced by an instrument in writing executed by Lessee, which shall identify and describe the lands included in the unit as revised and shall be recorded in Conveyance Records of the Parish where the lands herein leased are situated."

On Application for Rehearing.
En Banc. Rehearing denied.
HOOD, J., is of the opinion that a rehearing should be granted.
NOTES
[1] "Lease well" connotes a well drilled on a leased tract of land not within a unit (or within a unit which has terminated or ceased to exist).
[2] "Unit well" connotes a well drilled within a valid unit, so that the mineral royalties due as a result of production therefrom are payable pro rata to the royalty owners on all the tracts within the unit, rather than just to the royalty owners of the tract upon which the well was drilled.
[3] On January 13, 1961, Grande filed a concursus proceeding in the district court, impleading all royalty owners of the 160-acre tract, depositing into court all royalty proceeds due from the production of J. B. McDonald No. 1. By this concursus proceeding, Grande requested the court to determine the rights of the respective royalty owners to such proceeds of production. This concursus proceeding is independent of the present suit, and it is not involved in this appeal.
[4] The writer disagreed in the cited decision with the majority's holding that the unit terminated upon geological findings suggestive that part of the acreage included within the contractual unit was non-productive. This was based upon the writer's belief that, upon completion of a producing well, the rights of all the royalty owners within the unit became vested, since all of them had as consideration given up the right to have drilling on their own individual tracts, in favor of the single drilling upon another tract within the unitized area. The writer does not, however, necessarily agree that any vested right in a unit accrues when drilling pursuant to the unitization agreement does not result in production.