510 So.2d 102 (1987)
Oneida Leblanc BARES, et al., Plaintiffs-Appellants,
v.
The STONE OIL CORPORATION, et al., Defendants-Appellees.
No. 86-605.
Court of Appeal of Louisiana, Third Circuit.
June 26, 1987.
Rehearing Denied August 12, 1987.
Allen Bares, Lawrence Donohoe, of Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, for plaintiff-appellee.
Andrew Gates, Lafayette, for defendant-appellee-appellant.
Charles F. Bailey, Lafayette, John McCollam, Gordon, Arata, McCollam, Stuart & Duplantis, New Orleans, for defendants-appellants.
Roger Sellers, of Thompson and Sellers, Abbeville, Charles Wooten, Lafayette, for intervenor-appellee.
Before DOMENGEAUX, LABORDE and YELVERTON, JJ.
YELVERTON, Judge.
These two consolidated cases are basically a dispute over which of two sets of mineral leases are now in effect. From a partial summary judgment in favor of the landowners finding that the first (old) set of leases had been novated by a later (new) set of leases and thereby extinguished, and *103 finding in the alternative that the declared unit was invalid thereby failing to maintain the old leases beyond their primary term, both sides have appealed. We reverse, finding genuine issues of material fact, and we remand to the lower court for further proceedings.
In the captioned case plaintiffs (all named Bares), certain landowners in Vermilion Parish, filed suit originally against the Stone Oil Corporation, alleging that four mineral leases (the old leases), which they had executed in the 1970s, had been novated and thereby extinguished by four new mineral leases covering the same properties which were granted by them in 1981 to Stone Oil Corporation. These landowner-plaintiffs prayed that the new leases be decreed to be in full force and effect, and that they be awarded double the royalties due under the new leases together with legal interest and attorney's fees. By supplemental and amending petition plaintiffs joined as additional defendants all other parties having leasehold or overriding royalty interests in the old leases. This petition also alleged that, even if the old leases had not been novated, they had expired by their own terms, and had not been maintained by operation beyond their primary terms. The landowners additionally alleged that the declared unit relied upon by Stone Oil and the other defendants for holding the old leases in force was an invalid unit.
The captioned suit was consolidated in the district court with Savoy v. Stone Oil Corporation, (our appeal number 86-606). The plaintiffs in that suit are landowners having an interest in one of the old and new leases; their suit sought identical relief against the defendants.
The suits were filed in 1982. After considerable discovery, in 1983 motions for summary judgment were filed in the consolidated cases by the defendants Phillips Petroleum Company, The Dow Chemical Company, APD Companies, North American Royalties, Energy Development Corporation and James Smyth. The Stone Oil Company and the other remaining defendants also filed motions for summary judgment but later compromised their differences with plaintiffs and were dismissed from both cases. After the defendants filed their motions for summary judgment, the plaintiffs-landowners promptly filed an opposition to the defendants' motions, and, alternatively, moved for summary judgment themselves.
The motions were heard in 1984 and in 1985 they were ruled upon, the trial court dismissing the defendants' motions and partially sustaining plaintiffs'. The trial court rendered a summary judgment, signed in 1986, finding that the old leases had been novated by the new leases, and that they were therefore no longer in force and effect. The trial court also believed it was necessary to consider the validity of the declared unit, and found that the declared unit was established in bad faith and that it was therefore invalid; accordingly, it found that the declared unit did not operate to extend the new leases past their primary terms. The judgment awarded the landowners the accrued royalties under the new leases to the extent attributable to the leasehold interests of the undismissed defendants, together with legal interest. The trial court also awarded the plaintiffs in suit no. 86-605 (Bares) attorney's fees. The trial court dismissed plaintiffs' other demand in their motions for summary judgment. A copy of the trial court's reasons for judgment is attached to our opinion as an appendix.
Defendants appealed from that judgment to the extent that it sustained plaintiffs' motions for summary judgment. Defendants also applied to this court for a supervisory writ (our docket no. 86-1151) seeking a review of the dismissal of their motion for summary judgment.
Plaintiffs in docket no. 86-605 appealed from that part of the judgment dismissing their demands for cancellation of the new leases and double royalty penalties to date of cancellation. Plaintiffs in docket no. 86-606 have answered defendants' appeal raising the same issues. Plaintiffs have also filed a supervisory writ (our docket no. 86-1151) substantially raising the same issues and requesting the same relief.
*104 We have consolidated these appeals and supervisory writs for consideration and today render separate judgments in each. See Savoy v. Stone Oil Corporation, 510 So.2d 111 (La.App. 3rd Cir.1987); Bares v. Stone Oil Corp., 510 So.2d 111 (La.App. 3rd Cir.1987); and Bares v. Stone Oil Corp., 510 So.2d 112 (La.App. 3rd Cir. 1987).
The only issue before us is whether there are issuesgenuine issues of material facts regarding the two findings made by the trial court as to novation and the validity of the declared unit.
Our review of this case has proceeded and is based on the assumption that we are reviewing a summary judgment, not a judgment on the merits. At the beginning of our study of this appeal we were a little puzzled by two things: (1) the trial court's ambiguous remark in her reasons for judgment that "[a]ll of the litigants have agreed that this lawsuit is in an appropriate posture for decision on motion for summary judgment", and (2) an argument in brief by one sidethe side that wonurging that we review for clear error. But if these two things were suggestive that this was considered a trial on the merits, nothing else in the record is. The language of summary judgment has been employed throughout, in the pleadings, in the reasons for judgment and the judgment itself, and in the briefs on appeal. It is true that no one has argued that there are genuine issues of material fact, but that is because each side firmly believes that the summary judgment evidence presented establishes beyond a doubt its version of the facts. There is no stipulation in the record, no colloquy in the trial court, nothing in the briefs, and no mention in oral arguments to intimate that the judgment under review was a judgment on the merits. Obviously, we cannot review it as both a summary judgment and as one on the merits. We have, and do, accordingly review it for what everybody says it is: a summary judgment.
Summary judgment law in this state was explained by our Supreme Court in Industrial Sand and Abrasives, Inc. v. Louisville and Nashville Railroad Company, 427 So.2d 1152 (La.1983):
"La.C.C.P. art. 966 provides that any party may move for a summary judgment at any time, and the mover is entitled to summary judgment in his favor `if the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to a material fact, and that the mover is entitled to judgment as a matter of law.' Sanders v. Hercules Sheet Metal, Inc., 385 So.2d 772 (La.1980); cf. Fed. Rule Civ.Pro. 56. The burden is on the mover to show clearly that there is not a genuine issue of material fact in dispute, and any reasonable doubt as to the existence of a genuine issue of material fact must be resolved against the mover and in favor of trial on the merits. Thornhill v. Black, Sivalls & Bryson, 394 So.2d 1189 (La.1981); White v. Baker Manor Nursing Home, 400 So.2d 1168 (La.App. 1st Cir.), writs denied, 408 So.2d 68 (La.1982); cf. Erco Industries, Ltd. v. Seaboard Coast Line Railroad Co., 644 F.2d 424 (5th Cir.1981); Joplin v. Biss, 631 F.2d 1235 (5th Cir. 1980).
"To satisfy this burden, the mover must meet a strict standard of showing that it is quite clear as to what is the truth and that there has been excluded any real doubt as to the existence of a genuine issue of material fact. The pleadings, affidavits, and documents of the mover must be scrutinized closely, while those of the opponent to the motion are to be indulgently treated. Vermilion Corp. v. Vaughn, 397 So.2d 490 (La.1981); Mashburn v. Collin, 355 So.2d 879 (La.1977); cf. Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)."
Summary judgment procedure should be used both cautiously and sparingly and not as a substitute for trial. Mecom v. Mobil Oil Corporation, 299 So.2d 380 (La.App. 3rd Cir.1974), writ denied 302 So.2d 308 (La.1974).
The summary judgment evidence reveals that plaintiffs executed four mineral leases *105 in the 1970s, three to Dow Chemical Company and one to Phillips Petroleum Company. By assignment these leases became vested in the defendants. The old leases provided for a royalty of 1/6th. On August 25, 1980, Phillips Petroleum, Dow Chemical, North American Royalties, and Energy Development Corporation entered into a farmout agreement with Robert Zinn to drill a well and cause a conservation unit to be created for the well. On October 21, 1980, Zinn assigned the farmout agreement to Stone under an arrangement whereby Stone Oil would act as operator. In November 1980 Stone Oil commenced the test well.
On January 7, 1981, approximately one month before the expiration of the primary terms of the old leases, Stone hired Charles deGravelles, a lease broker, to obtain new leases from the landowners. Two landmen employed by deGravelles obtained four new leases which were to begin on the last day of the primary terms of the old leases. The new leases provided for a greater percentage of royalties than the old leases. On February 4, 1981, a 160-acre unit was declared around the well under the pooling provisions of the old leases.
The landowners offered evidence to establish that the intent of the parties in executing the new leases was to novate the old leases. The plaintiffs introduced a number of depositions containing testimony that the two landmen who negotiated the new leases identified themselves as agents of Stone Oil. The deponents stated that they were told Stone Oil was presently the owner of the old leasehold interests and that Stone Oil wished to acquire new leases. Allen Bares represented several of the landowners in their negotiations and proposed that language be placed in the new leases stating that the new leases replaced the old leases. Stone Oil indicated to de-Gravelles that such language was not necessary since the well could not be completed in time to save the old leases. The landowners stated the new leases were intended by the parties to replace the old leases.
The defendants introduced depositions of the two landmen which disputed the landowners' version of the negotiations. The two landmen's depositions revealed that they informed the landowners that they were seeking top leases upon the old leases. They stated that they informed the landowners as to the definition of a top lease. According to the depositions, they explained to the landowners that the new leases would not go into effect until the expiration of the old leases. They denied telling the landowners that Stone Oil was the owner of the old leases.
The defendants also argue that the landmen were not authorized by either Philips, Dow, North American Royalties, Energy Development, or James Smyth to terminate the old ones. The plaintiffs argue that the farmout agreement authorized the landmen to renew or extend the old leases and that they therefore had authority to acquire the new leases and terminate the old leases.
The plaintiffs argued and the trial court found, that even if the old leases did not terminate by the acquisition of the new leases, the declared unit was invalid, and that therefore for that reason alone the leases were not extended past their primary terms. In order to find the unit invalid, the trial court had to find that there was no genuine issue of fact that the defendants were in bad faith when they formed the declared unit and that it was established solely to maintain the old leases and avoid the higher royalty provided in the new leases.
The plaintiffs presented evidence that revealed the unit was not declared until three days before the expiration of the old leases. The defendants' executives did state that the expiration of the old leases and the higher royalty payments were a factor in establishing the unit. However, the evidence also contains some support for the argument that the declared unit was established for conservation purposes. They considered that by declaring the unit the defendants would have to drill only one well and they attempted to include all the acreage within the same reservoir so that the well would drain the acreage.
*106 From the evidence each of these questions remain genuine issues of material fact. Summary judgment was improper. C.C.P. art. 966. To resolve the issues of whether the new leases were intended as top leases or intended to terminate the old leases, and whether the defendants declared the unit solely to maintain the old leases or together with conservation purposes, requires the weighing of conflicting evidence on material facts, and credibility determinations, neither of which are appropriate in summary judgment procedure. See Mecom v. Mobil Oil Corp., supra.
The interpretation of the farmout agreement also involves factual considerations concerning the understanding and intent of the parties, and will also involve credibility issues. Summary judgment in this situation is also not warranted. See Pickering v. Hercules, Inc., 486 So.2d 1185 (La.App. 3rd Cir.1986).
For the reasons above the judgment granting plaintiffs' partial summary judgment is reversed and set aside and the case is hereby remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.

APPENDIX

REASONS FOR JUDGMENT
The matter before this Court is complex in many respects. The Court's burden in determining the rights of the respective parties includes an assessment of mineral law as well as the laws which relate to leases, obligations and more particularly those which relate to novation.
The substance of this litigation is represented by eight voluminous court volumes reflecting pleadings, numerous exhibits, depositions, and in fact the taking of testimony in open Court.
All of the litigants have agreed that this lawsuit is in an appropriate posture for decision on motion for summary judgment. Both sides have filed motions for summary judgment.
The defendants are listed as follows:
THE STONE OIL CORPORATION, THE STONE PETROLEUM CORPORATION, THE STONE OIL CORPORATION 1980 PROGRAM I, LTD., THE STONE OIL CORPORATION 1980 II, LTD., THE STONE OIL CORPORATIONALL STATE 1980 DRILLING VENTURE, X-OIL ENERGY RESOURCES, INC., ROBERT L. ZINN d/b/a ZINN PETROLEUM COMPANY, MOORE McCORMACK OIL AND GAS CORPORATION, PHILLIPS PETROLEUM COMPANY, THE DOW CHEMICAL COMPANY, NORTH AMERICAN ROYALTIES, INC., ENERGY DEVELOPMENT CORPORATION, APD COMPANY AND JAMES E. SMYTH.
Plaintiffs who have filed a counter motion for summary judgment are as follows:
ONEIDA LEBLANC BARES, MRS. ALPHONSINE HEBERT BARES, MAURICE G. BARES, EDIER BARES, EFFIE BROUSSARD BARES, AND HARRIS BARES.
The status and effect of eight oil leases is in question. The first four leases listed below are referred to collectively as the "Old Leases." They are as follows:
(1) Lease dated February 8, 1973, recorded at COB 745, Folio 506, Entry No. 214523, as amended by agreement dated December 3, 1977, recorded at COB 863, Folio 100, Entry No. 247158 executed by Sidney E. LeBlanc, Oneida LeBlanc Bares, Wanda LeBlanc Savoy, and their mother, Bernadette L. LeBlanc, now deceased, in favor of Dow Chemical Company;
(2) Lease dated February 10, 1973, recorded at COB 745, Folio 502, Entry No. 214522, as amended by agreement dated December 5, 1977, recorded at COB 863, Folio 105, Entry No. 247159, from Alphonsine Hebert Bares and Maurice G. Bares in favor of Dow Chemical Company;
(3) Lease dated January 16, 1978, recorded at COB 806, Folio 126, Entry No. 246891, from Harris Bares, through his duly appointed and qualified curatrix, Alphonsine Hebert Bares, acting pursuant to court order, in favor of Phillips Petroleum Company;

*107 (4) Lease dated February 10, 1973, recorded at COB 745, Folio 779, Entry No. 214629, as amended by agreement, dated December 3, 1977, recorded at COB 863, Folio 110, Entry No. 247160, Edier Bares, husband of Effie Broussard Bares, in favor of the Dow Chemical Company.
The leases listed below will collectively be referred to as the "New Leases." They are as follows:
(5) Lease dated January 7, 1981, but effective as of February 8, 1981, recorded at COB 954, Folio 114, Entry No. 81-211, from Sidney E. LeBlanc, Oneida LeBlanc Bares and Wanda LeBlanc Savoy in favor of The Stone Oil Corporation;
(6) Lease dated January 7, 1981, but effective as of February 10, 1981, recorded at COB 954, Folio 126, Entry No. 81-214, from Alphonsine Hebert Bares and Maurice G. Bares in favor of The Stone Oil Corporation;
(7) Lease dated January 7, 1981, but effective as of January 16, 1981, recorded at COB 954, Folio 679, Entry No. 81-360, from Harris Bares, an interdict, represented by Alphonsine Hebert Bares, his duly appointed and qualified curatrix, acting pursuant to court order, in favor of The Stone Oil Corporation;
(8) Lease dated January 7, 1981, but effective as of February 10, 1981, recorded at COB 954, Folio 118, Entry No. 81-212, from Edier Bares and his wife, Effie Broussard Bares, in favor of The Stone Oil Corporation;
Robert L. Zinn acquired certain rights to explore and develop lands covered and affected by certain oil, gas and mineral leases which were owned by the following grantors:
PHILLIPS PETROLEUM COMPANY, THE DOW CHEMICAL COMPANY, NORTH AMERICAN ROYALTIES, INC., and ENERGY DEVELOPMENT CORPORATION. A Farmout Agreement between these parties was executed on August 25, 1980 and it included the right to explore and develop lands covered by the Old Leases listed above. The objective of this agreement was to permit Zinn to drill one or more exploratory wells in an effort to test and develop the Camerina I Sand which in turn would earn Zinn certain leasehold interests of the above listed grantors in the lands affected by the Farmout Agreement. In the Farmout Agreement, Zinn obligated itself as follows: "to fully comply with and timely perform each and every duty, obligation and covenant, both express and implied provisions and conditions of said oil and gas leases and of intermediate assignments thereof, if any, imposed upon the lessee and/or assignee thereby insofar as concerns the Assigned Premises."
Adding a twist to this factual context, the Stone Oil Corporation and other defendants in this lawsuit acquired ownership of the rights which Zinn had acquired in connection with the above described farmout agreement. In effect, Stone Oil Corporation assumed Zinn's position and began operations targeted to earn leasehold interests of the affected lands. The Stone Oil Corporation began drilling the Meuse Broussard No. 1 well on November 10, 1980. As will be seen, dates of both the Old and New Leases become critical.
All of the Old Leases that were affected by the Farmout Agreement described above had an expiration date of February, 1981 as to the primary term. Certain operations or production on the leases or on lands pooled were necessary in order to preserve these Old Leases into a secondary term. The Stone Oil Corporation, being confronted with the rapidly approaching expiration date, elected to acquire New Leases of the same land covered by the Old Leases. These new leases were acquired on January 7, 1981. It is imperative to note that the New Leases were taken on the very same land that was subject to the Old Leases. Each of the New Leases except one was to become effective on the last day of the primary term of the Old Lease. The New Leases were more favorable to the land owners than the Old Leases in that the New Leases provided for 1/4 royalty and 1/5 royalty in comparison to the *108 Old Leases which all provided for 1/6 royalty. Additionally, the New Leases provided for substantially greater payment of rentals than did the Old Leases.
Three days before the primary term of the first of the Old Leases expired, and during the drilling of the Meuse Broussard No. 1 Well, Stone Oil Corporation, together with other certain defendants in this lawsuit, created a 160-acre declared unit for the well. A unit was established pursuant to the pooling authority conferred under the pooled leases. Some of the lands covered by the Old Leases were included in this unit. In fact, that portion of land covered by the Old Leases made up 33.425% of the total surface area of the unit. Although the unit declaration did identify the Old Leases, it also purported to cover and affect the New Leases acquired by Stone on the pooled lands prior to the units' creation. Defendants in this lawsuit take the position that their actions preserved the pooled leases in full force and effect beyond their respective primary terms.
Defendants argue that the commencement of drilling operations under the Meuse Broussard No. 1 Well under the declared unit together with the tender of Pugh Clause rentals on the acreage outside of the unit was sufficient to preserve the Old Leases.
It is important to note that the Meuse Broussard No. 1 Well was completed as a commercial producer on April 15, 1981. The Department of Conservation Unit designated as the CAM 1 RC SU A was established pursuant to an order No. 902-A-4 of the Commissioner of Conservation. The Order was effective on June 23, 1981, and actual production began on October 22, 1981 from the sand that was unitized by the Commissioner of Conservation.
With that background, the Court's task becomes readily apparent. The question more particularly to be decided is whether or not the rights and obligations of the parties are to be governed by the Old Leases or the New Leases. In essence the Court must determine whether or not the acquisition of the New Leases has the effect of novation upon the Old Leases. In addition, further inquiry must be made as to whether or not the declared unit of February 4, 1981 was properly created.
When Stone Oil Company acquired the New Leases from plaintiff, Stone acted as an agent of the lessees of record under the Old Leases. This relationship is clearly apparent from the terms of the farmout agreement itself. In that agreement Stone was burdened with the obligation to comply with every duty and obligation and covenant of the oil and gas leases affected by the farmout agreement and in fact to indemnify the lessees of record if it failed to so perform. Under that very same farmout agreement, the lessees were likewise entitled to the benefit of all extensions or renewals of the farmout leases which Stone had acquired. Furthermore, while the farmout agreement purported to be a contract that would entitle Stone to earn a leasehold interest when it performed certain obligations, Stone represented itself to be the actual owner of the leasehold rights as Stone pursued the performance of the obligations that they had undertaken in connection with the farmout agreement. In furtherance of that assertion of ownership, Stone Oil with the concurrence of the lessees of record actually paid the 1981 Pugh Clause rentals which had accrued under the Old Leases. In addition, prior to the time Stone had earned any leasehold interest in the subject property, Stone joined with the lessees of record in creating a declared unit which pooled the Old Leases by an instrument that declared Stone to be an owner of those leases. In fact, when Stone negotiated with the plaintiffs in the acquisition of the New Leases, the plaintiffs were led to believe that Stone was in fact the new owner of the leasehold estate on their lands. The testimony taken in this matter clearly indicates that there was never an intention on the part of Stone that the New Leases were being acquired for Stone's sole interest. The testimony from one of Stone's ranking officers indicate that the New Leases were in fact being acquired for the benefit of the lessees as well as Stone and were also being acquired in order to preserve the rights of the granting parties under the farmout agreement. *109 The lessees under the Old Leases maintain that they certainly are entitled to an interest in the New Leases under the terms of the farmout agreement. Because the new leases provided for higher royalty burdens, there was obvious concern among the lessees of record and Stone as to the calculation of their respective interests. In view of all of the above observations there is no question in this Court's mind but that Stone acted as an agent of the lessees of record when Stone acquired the New Leases. The more difficult question is whether or not Stone's acquisition of the New Leases operated to novate the rights and obligations of the Old Leases in favor of the New Leases.
The pertinent provisions of the Louisiana Civil Code are as follows:

Article 1879. Novation is the extinguishment of an existing obligation by the substitution of a new one.

Article 1880. The intention to extinguish the original obligation must be clear and unequivocal. Novation may not be presumed.

Article 1881. Novation takes place when, by agreement of the parties, a new performance is substituted for that previously owed, or a new cause is substituted for that of the original obligation. If any substantial part of the original performance is still owed, there is no novation.
Novation takes place also when the parties expressly declare their intention to novate an obligation.
Mere modification of an obligation, made without intention to extinguish it, does not effect a novation. The execution of a new writing, the issuance or renewal of a negotiable instrument, or the giving of new securities for the performance of an existing obligation are examples of such a modification.
The Code Articles previously quoted indicate that novation is never to be presumed and the party who urges it has a burden of proof to establish if novation has occurred. Certain guidelines were established in the case entitled Placid Oil Company v. Taylor, 325 So.2d 313 (La.App. 3rd Cir.1975), writ refused, 329 So.2d 455 (La.1976). That case stands for the proposition that the Court may inquire as to the intention of the parties in determining whether novation has occurred and that that intention may be shown by the character of the transaction, by the facts and circumstances surrounding the transaction as well as by the terms of the agreement itself. As to the intentions of the litigants in this case at the time of the execution of the New Leases, it is clear that the parties are respective poles apart. Defendants say that they acquired the New Leases simply to obtain protection top leases and to protect their leasehold position in case the Old Leases expired at the end of their primary terms. Plaintiffs however say that the New Leases were granted in an effort to supercede the prior existing obligations under the Old Leases. This is a very plausible explanation on the part of the plaintiffs. Surely the plaintiffs knew that their leases were about to expire; they knew that they had dealt with oil companies other than Stone and were led to believe that Stone was now the owner of these Old Leases which were about to expire. Plaintiffs were clearly led to believe by Stone that the New Leases would be the law between the parties. Stone was the author of the New Leases and at no time did Stone verbalize in writing or otherwise its intent to avoid novation. In fact, none of the New Leases refer to the existence of the prior leases and by the very terms of the New Leases they purport to become effective as of the dates therein stipulated. In essence it was Stone who prepared the lease agreement and it was Stone who neglected to clarify any conflict of intention even though plaintiffs explained that it was their understanding that the effect and/or effects of novation would occur. This Court therefore holds that the New Leases effected a novation of the Old Leases and that therefore the New Leases have replaced the former Old Leases as of the effective date stipulated in each of the New Leases.
While this Court is absolutely convinced that novation has occurred, in the interest of answering all issues and questions placed before the Court, a discussion of the *110 validity of the declared unit is now appropriate.
While it is true that a mineral lessee does not have a fiduciary obligation to his lessor, it is clear that the lessee must perform a contract in good faith and must develop and operate the property leased as a reasonably prudent operator for the benefit of the lessee and the lessor. The Third Circuit Court of Appeal in the case of McDonald v. Grande Corporation, 148 So.2d 441 (La.App. 3rd Cir.1962), cert. denied, 244 La. 128, 150 So.2d 588 (1963), discusses in detail the duty imposed by the obligation of good faith.
Again in Mallet [Mallett] v. Union Oil and Gas Corporation of Louisiana, 232 La. 157, 94 So.2d 16 (1957) the Louisiana Supreme Court dealt decisively with the issue of voluntary pooling.
It must be remembered that the defendants take the position that because some of the lands in the Old Leases were voluntarily pooled with producing property, defendants have preserved their rights under the Old Leases. In order for this position to be maintained by the Court, the Court must find that lessees acted in accordance with the standards set forth by the Louisiana Supreme Court in the above cited cases. The most pertinent language from the above cited case is as follows:
"In other words, if the right to pool with producing property is given it must be specifically set out in the lease and cannot be eked out by innuendo. The contract must be construed against the lessee for he either prepares the lease or furnishes the prepared form."
It is clear to observe that the lessee is limited by duty which prohibits him from arbitrarily acting in a purely self-interest manner when the lessee exercises the pooling powers conferred in the lease document. It is this Court's firm opinion that the overriding consideration for the creation of a declared unit during drilling operations was solely motivated by the desire of lessees to extend the Old Leases beyond their primary terms so that the lessees would encounter lesser royalty obligations under the Old Leases to further preserve the economic benefits to the lessees. No other valid purpose for the creation of that unit is substantiated. In fact there is no testimony which can explain and/or identify a valid conservation purpose to support the said unit. This kind of pooling for the primary purpose of extending a lease beyond its primary term is clearly prohibited under the jurisprudence of this state as is articulated by the Louisiana Supreme Court in the above mentioned case. The record is replete to support the conclusion of this Court. In summary the Court will suggest that there was no conservation purpose served by creation of this unit. The unit was conceived and created in fact during drilling operations in an apparent last minute effort to preserve the Old Leases. The declared unit became effective three days prior to the earliest expiration date of those leases. There was a complete lack of any geological consideration for the declared unit, which included dry and non-productive acreage in each of the unitized sands, even though Stone had taken geological study of all of the prospective sands in the area before it acquired the farmout rights. This declared unit included proven unproductive acreage at the time of its creation and is therefore in violation of the requirement of good faith imposed upon the lessee and is obviously invalid. The Court therefore further finds that the declared unit was in fact declared in bad faith. As a result that unit cannot [have] and has no legal effect upon the Old Leases.
The Court further finds that the New Leases are in full force and effect. All accrued royalties from the date of first production of the Meuse Broussard No. 1 Well are payable to plaintiffs under the terms of the New Leases; further, the Court having found bad faith on the part of the defendants in their refusal to pay the royalties due under the New Leases despite amicable demand by plaintiffs, shall award plaintiffs interest on the amount of royalty due from date of judicial demand until paid together with attorney fees in the sum of $30,000.00 in accordance with the provisions *111 of the Louisiana Mineral Code Article 140.
Judgment shall be signed upon presentation.
Lafayette, Louisiana this 18th day of December, 1985.
 /s/ Sue Fontenot
 SUE FONTENOT, JUDGE
 15th Judicial District
 Court
 Division "G"